IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FLORENCIO OLGUIN,

       Plaintiff/Counter-Defendant,

   vs.                       No. 1:07-cv-0785 MCA/RHS

INTEL CORPORATION,

       Defendant/Counter-Plaintiff

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant Intel Corporation's Motion to Dismiss or, in the Alternative, for Summary Judgment* [Doc. 15], filed December 21, 2007. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that Defendant's Motion should be **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

In this employment lawsuit, Plaintiff employee Florencio Olguin ("Olguin") complains of three employment practices by Defendant employer Intel Corporation ("Intel") that he claims are discriminatory or otherwise wrongful. These are: (1) hostile work environment allegedly resulting from discrimination against a serious medical condition; (2) failure to properly pay disability benefits; and (3) failure to award stock options allegedly due

1

him pursuant to contract.  The following facts are undisputed.

**Hostile work environment claim**

Olguin was employed as a Manufacturing Technician at Intel from March 1994 until he was terminated on July 12, 2005.  Beginning in 2002, Olguin was intermittently on leave for weeks or months at a time due to various medical problems.[1]  Olguin complains that when he was not out on leave, he experienced an intimidating, hostile and abusive work environment at Intel.  He claims he was subjected to negative performance reviews, threats, yelling, and accusations that he was unable to "mulitask."  He believes the allegedly adverse treatment he experienced was on account of his serious medical condition.

**Disability benefits claim**

Olguin's health worsened over time and he went on a final medical leave of absence in July 2004 which lasted until he was terminated in July 2005.  Olguin was enrolled in Intel's Voluntary Short-Term Disability Plan and received short term disability benefits during this last year of medical leave.  After a year on medical leave, it was determined that Olguin would not be able to return to work due to his disability.  [Doc. 19-3 at 2.] Accordingly, he was terminated from his position and began receiving Social Security Disability benefits.  [Id.]  He also began receiving long term disability benefits under Intel's Long-Term Disability Plan at or around the time he was terminated.  He continues to receive long term benefits and they will continue until he reaches the age of 65 so long as he remains

---

[1]The medical problems alleged include sleep apnea, heart disease, narcolepsy, anxiety, depression, chronic back pain, and umbilical hernia.

qualified under the terms of the Long-Term Disability Plan.

Under both the Voluntary Short-Term Disability Plan and the Long-Term Disability Plan, which are available to all employees, benefits are calculated based upon the recipient's pre-disability earnings.  Both plans also contain appeal procedures by which claimants may submit written requests for review of benefits determinations to the Disability Appeals Committee.

In October 2004, after Olguin had been on medical leave for about three months, Intel implemented a nationwide change to its nonexempt employee overtime pay practices.  This change resulted in an increase in Olguin's annual base pay from $29,918.64 ($14.38 per hour) to $32,568.29 ($15.70 per hour).  The short-term disability benefits Olguin was receiving at the time, however, were not increased to reflect the pay adjustment.  The long term disability benefits Olguin eventually began to receive also were based on his predisability pay and did not reflect the base pay increase that took effect while he was on disability leave.  Olguin did not submit a request for review to the Disability Appeals Committee.

**Stock Option Claim**

Intel also operates a Stock Option Plan and an Equity Incentive Plan for its employees.  As a nonexempt employee, Olguin was awarded stock grants in a predetermined amount, generally 60 stock options per year.  He received a supplemental grant of 26 options in March 2001 and another supplemental grant of 37 options in November 2002 to compensate for drops in stock value that left numerous employees with options above market

3

price.  By the time Olguin was terminated, he had accumulated 393 stock options.

Intel's Board of Directors has the authority to accelerate the vesting date of previously granted stock options.  As a matter of policy, stock option vesting dates are accelerated for employees who become disabled.  In November 2005, Intel notified Olguin by letter that the Compensation Committee of the Board of Directors had given its approval to accelerate the vesting date for his previously-granted stock options.  The letter stated that the stock options would be accelerated upon Intel's receipt of a signed acknowledgment form from Olguin.  However, due to an administrative error, the letter mistakenly indicated that the acceleration applied to 12,549 stock options when in reality it applied to 393 options.  The option expiration dates listed in the letter were also erroneous.  Olguin signed the acknowledgment form on November 25, 2005, and returned it to Intel.

Upon realizing its mistake, Intel sent Olguin a letter on November 25, 2005, informing him of the correct number of accelerated stock options—393—and the correct expiration dates.  Olguin never exercised any of his accelerated stock options and they all expired on July 12, 2007.

### B.    Procedural Background

On May 19, 2006, Olguin filed a Charge of Discrimination ("Charge") with the New Mexico Department of Labor, Human Rights Division ("HRD").  On April 12, 2007, the HRD issued a determination of "No Probable Cause" and dismissed Olguin's complaint with prejudice.

On July 12, 2007, Olguin filed a *Notice of Appeal and Complaint for Damages*

("Complaint") [Doc. 1-6] in the Thirteenth Judicial District, County of Sandoval, State of New Mexico.  Intel removed the case to federal court on August 15, 2007.

## II.   JURISDICTION

Intel removed this case on the grounds that certain of Olguin's claims are preempted by federal law and that supplemental jurisdiction may be exercised over the claims that are not preempted.  [Doc. 1 at 2–6.]  Intel also claims that the Court may exercise diversity jurisdiction.  [Id. at 6–7.]  Olguin has not challenged the removal of this case nor moved to remand.  He also does not oppose Intel's argument that his disability benefits claims are preempted.  However, because the Complaint appears to assert only state law causes of action, an independent inquiry into the Court's jurisdiction is appropriate.  *Lance v. Coffman*, __ U.S. __, 127 S.Ct. 1194, 1196 (2007) (court must satisfy itself that it does in fact have jurisdiction before proceeding to the merits); *see also Kennedy v. Lubar*, 273 F.3d 1293, 1301 n.10 (10th Cir. 2001).

### A.   Federal question jurisdiction under the Employee Retirement Income Security Act of 1974 ("ERISA")

#### 1.   *Complete preemption under § 502*

ERISA was enacted to provide a uniform regulatory regime over employee benefit plans and to provide ready access to federal courts.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).  Essential to ERISA's purpose is its civil enforcement provision, section 502(a).  *Id.*  "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the

5

ERISA remedy exclusive and is therefore pre-empted." *Id.* at 209.  Section 502(a) has such

"extraordinary pre-emptive power" that it converts state law causes of action falling within

its scope into federal claims for purposes of determining the propriety of removal.  *Id.*

Claims that fall within section 502(a) are thus said to be "completely" preempted in that a

federal cause of action replaces the preempted state claim.  *Felix v. Lucent Tech. Inc.*, 387

F.3d 1146, 1156–57 & n.9 (10th Cir. 2004).  On the other hand, claims that fall within § 514

of ERISA are merely conflict preempted.  *Id.* 1156.  Conflict preemption is not sufficient of

itself to support federal jurisdiction.  *Id.*

Section 502(a)(1) of ERISA provides a cause of action to any "participant or

beneficiary...to recover benefits due to him under the terms of his plan, to enforce his rights

under the terms of the plan, or to clarify his rights to future benefits under the terms of the

plan.  *Felix*, 387 F.3d at 1158 (quoting 29 U.S.C. § 1132(a)(1)) (quotation marks omitted,

ellipses in original).  "Participant" means:

> any employee or former employee of an employer, or any member or former member
> of an employee organization, who is or may become eligible to receive a benefit of
> any type from an employee benefit plan which covers employees of such employer
> or members of such organization, or whose beneficiaries may be eligible to receive
> any such benefit.

29 U.S.C. § 1002(7).

Here, it is undisputed that Olguin is a former employee of Intel.  It also is undisputed

that he is entitled to at least some benefits—only the amount of benefits due is disputed.

Thus the question is whether the two disability plans at issue are "employee benefit plans."

If so, Olguin's claim for disability benefits is completely preempted.

6

## 2. *"Employee benefit plan"*

One form of employee benefit plan governed by ERISA is an "employee welfare benefit plan." *Peckham v. Gem State Mut. of Ut.*, 964 F.2d 1043, 1047 (10th Cir. 1992).  An "employee welfare benefit plan" means:

> ...any plan, fund, or program...established or maintained by an employer...to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries...medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits....

29 U.S.C. § 1002(1).  The Court considers below whether the plans meet this definition.

A "plan, fund or program" under ERISA exists if "a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits." *Peckham*, 964 F.2d at 1048 (citations and quotation marks omitted).  Examination of the plan documents indicates that: (1) the intended benefits are disability benefits; (2) the beneficiaries are Intel employees; (3) the sources of financing are employee and Company contributions; and (4) the procedures for receiving benefits are set forth in significant detail.  [Docs. 1-2, 1-3.]

The "established or maintained" requirement appears designed to "ensure that the plan is part of an employment relationship." *Peckham*, 964 F.2d at 1049.  This portion of the definition is satisfied in this case because Olguin's employer either paid or facilitated contributions to both plans.  Furthermore, the plans were established for the purpose of providing disability benefits.

Finally, the benefits must have been provided to "participants or their beneficiaries."

The term "participant" includes "any employee or former employee of an employer."  29 U.S.C. § 1002(7).  As discussed above, it is undisputed that Olguin was an employee of Intel. He therefore is a "participant."

The Court thus concludes that both the Short-Term Disability Plan and the Long-Term Disability Plan meet the definition of an ERISA "employee welfare benefit plan."  To the extent Olguin seeks disability benefits under these plans, his claims fall within the scope of section 502(a) and are removable to federal court.  *See Davila*, 542 U.S. at 209.

### B.    Supplemental jurisdiction

Payment of disability benefits, however, is not the only relief Olguin seeks.  He also seeks damages for discrimination, an allegedly hostile work environment, and denial of stock options.  These claims are not preempted because they do not seek benefits nor are they factually related to the disability plans.

The Court nevertheless could potentially assert supplemental jurisdiction over these state law claims if they are so related to the preempted claims "that they form part of the same case or controversy."  29 U.S.C. § 1367.  There are several factors the Court should consider when deciding whether to exercise supplemental jurisdiction.  29 U.S.C. § 1367(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).  However, the Court need not determine whether it should exercise supplemental jurisdiction over Olguin's state law claims because, as explained below, diversity exists as an independent basis for federal jurisdiction over this action.

### C.    Diversity jurisdiction

A federal district court may exercise jurisdiction over a civil action if the parties are diverse and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).  Removal of a state court action to federal district court is controlled by 28 U.S.C. § 1441, which states, in relevant part,

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a).

It is apparent from the record that the parties are diverse.  Olguin resides in Sandoval County, New Mexico.  [Doc. 1-6 at 1]  Intel is incorporated under the laws of Delaware and has its principal place of business in California.  [Doc. 1-4, ¶ 2.]  Thus, the question is whether the amount in controversy exceeds $75,000.

The amount in controversy normally is determined by the allegations in the complaint or, where they are not dispositive, by those included in the notice of removal.  *Laughlin v. K-Mart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995) (internal citation omitted).  When neither document suffices, the court may look to other relevant materials in the record at the time of removal.  *See Varela v. Wal-Mart Stores, E., Inc.*, 86 F. Supp. 2d 1109, 1111 (D.N.M. 2000).

In the case of an action originally brought in federal court, the plaintiff's claimed amount is presumed to support diversity jurisdiction.  *Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1289 (10th Cir. 2001). "The same is not true, however, when the case has been removed from state court." *Id.*  In such a case, the defendant's claim as to the amount in

9

controversy does not enjoy the same presumption of accuracy as does the plaintiff's. Additionally, where the plaintiff has failed to specify damages, the defendant bears the burden of proving the amount in controversy by a preponderance of the evidence. *Id.* at 1289–90. Bare allegations that the amount exceeds the jurisdictional minimum are insufficient; rather, the removing party must set forth the underlying facts supporting the assertion that the $75,000 minimum has been met. *See Laughlin*, 50 F.3d at 873.

On the other hand, in its attempt to determine the amount in controversy, the Court may not ignore the context of the case, as informed by the substance of the complaint or by other material in the record at the time of removal. *See Hanna v. Miller*, 163 F.Supp.2d 1302, 1305 (D.N.M. 2001). For example, the Court may look to (1) the substance and nature of the injuries and damages described in the pleadings; (2) attorney affidavits filed prior to or in connection with the removal notice; and (3) a plaintiff's prior admission in open court that the value of the claim exceeds the jurisdictional amount, or the plaintiff's refusal to admit that he or she is not seeking damages in excess of the statutory minimum. *Id.* at 1306 (collecting cases); *see also Varela*, 86 F.Supp.2d at 1111.

In this case, the Complaint does not mention a specific dollar figure. Defendant's Notice of Removal [Doc. 1], however, supplies the information necessary to determine whether the amount in controversy exceeds $75,000. The Court considers below the elements of damages in dispute.

### 1.    Amount in controversy over disability benefits

Olguin claims he was entitled to receive an adjustment to his disability benefits to

reflect a company-wide base pay increase that occurred in October 2004. [Doc. 1-6 at 6.] The effect of the adjustment was to increase Olguin's pay by 9.157%. [Doc. 1 at 6; doc. 1-5, ¶ 2.] Olguin appears to claim that he is entitled to a corresponding increase in both his short and long term disability benefits. At the time of the pay increase, Olguin was receiving short term disability benefits in the amount of $447.06 per week, which he continued to receive until July 2005, for a total of 40.43 weeks. [Doc. 1-5, ¶ 2.] Olguin thus received approximately $18,074.64 in short term benefits. If Olguin were entitled to receive an increase of 9.157%, he would receive an additional $1,655.09 in short term benefits.

Olguin began receiving long term benefits in the amount of $1,937.27 per month in July 2005. [Doc. 1-5, ¶ 5.] He will continue to receive these benefits until he turns 65 years old on February 18, 2030—a total of 296 months. [Id.] He thus will receive $573,431.92 in long term disability benefits. If he were entitled to an increase of 9.157%, he would receive an additional $52,509.16. Thus, the total amount of disability benefits in controversy is $54,164.25 ($1,655.09 + $52,509.16).

### 2.    Amount in controversy over stock options

With regard to Olguin's stock option claim, he alleges that he should have received an option to purchase 12,549 shares of Intel stock rather than only 393 shares. [Doc. 1-6 at 7–8.] The profit Olguin could have realized had he received and exercised 12,549 options can be determined by multiplying the number of options by the difference between the option price and the market price at the date of the grant. This information is provided by the affidavit of Intel's Human Resources Investigator, Maria Yamashiro [Doc. 1-4 at 1]:

| Grant Date | Market price | Option price | No. of Options Olguin claims | Olguin's potential profit |
|---|---|---|---|---|
| 8/22/2000 | $27.49 | $72.875 | 3900 | 0 |
| 3/21/2001 | $27.49 | $25.6875 | 1868 | $3,367.07 |
| 4/10/2001 | $27.49 | $24.225 | 1900 | $6,203.50 |
| 10/31/2001 | $27.49 | $24.365 | 1050 | $3,281.25 |
| 11/25/2002 | $27.49 | $20.230 | 1205 | $8,748.30 |
| 11/25/2002 | $27.49 | $20.230 | 526 | $3,818.76 |
| 4/22/2003 | $27.49 | $18.630 | 1050 | $9,303.00 |
| 4/15/2004 | $27.49 | $26.995 | 1050 | $519.75 |
| | | **TOTAL** | **12,549** | **$35,241.63** |

The above calculations indicate that the value of the 12,549 options Olguin asserts he was entitled to receive is $35,241.63.

The value of the 393 shares that are not in dispute must be subtracted from this sum to determine the amount in controversy over the stock options. The value of the 393 options can be estimated from the facts that are undisputed in Intel's motion and the letter Intel sent to Olguin advising him of the correct number of options and their prices. [Doc. 16 at 4; doc. 16-17 (Intel's Ex. P).]

| Grant Date | Market price | Option price | No. of Options Olguin claims | Olguin's potential profit |
|---|---|---|---|---|
| 4/13/1999 | unknown | $30.7032 | 60 | unknown |
| 4/25/2000 | $27.49 | $61.1875 | 60 | 0 |
| 3/21/2001 | $27.49 | $25.6875 | 26 | $46.87 |
| 4/10/2001 | $27.49 | $24.225 | 60 | $195.90 |

| | | | | |
|---|---|---|---|---|
| 10/31/2001 | $27.49 | $24.365 | 60 | $187.50 |
| 11/25/2002 | $27.49 | $20.230 | 37 | $268.62 |
| 4/22/2003 | $27.49 | $18.630 | 30 | $265.80 |
| 4/15/2004 | $27.49 | $23.355 | 60 | $248.10 |
| | | **TOTAL** | **393** | **$1,212.79** |

The above calculations indicate that the value of the 393 options that are not in dispute is $1,212.79. Thus, the amount in controversy over the stock options is $34,028.84 ($35,241.63 - $1,212.79).

### 3.    Total amount in controversy

The amount in controversy over the disability benefits and the stock options is $88,193.09 ($54,164.25 + $34,028.84). This sum exceeds the jurisdictional requirement of $75,000 even before any potential damages for damages for hostile work environment are considered. This sum also does not include any deduction for the options issued on April 13, 1999 because the record does not reflect the market price for that date. However, even if the market price in April 1999 was 10% of the market price of $27.49 a year later, Olguin's profit from sixty options would have been approximately $1,670—not sufficient to reduce the amount in controversy to below $75,000.

The Court therefore concludes that Intel has met its burden of establishing that the amount in controversy exceeds $75,000 such that the Court may exercise diversity jurisdiction. The Court will now proceed to the merits of this action.

## III.    SUMMARY JUDGMENT STANDARDS

Intel seeks dismissal of all Olguin's claims under Rule 12 of the Federal Rules of Civil Procedure, or, alternatively, summary judgment under Rule 56.  Because both parties have submitted evidence, which the Court has accepted, this motion will be considered under the summary judgment standards of Rule 56.  *See Jackson v. Integra Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991) (stating that "if matters outside the complaint are presented to and not excluded by the court, the motion should be treated as one for summary judgment under Rule 56 and not as a motion to dismiss").

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.

In ruling on a motion for summary judgment, the Court does not weigh the evidence and determine the truth of the matter, but simply determines whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for the factfinder to return a verdict for that party.  *Id.* 477 U.S. at 249.  Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element

14

of his case, as to which he has the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986); *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

## IV.   ANALYSIS

Olguin proceeds under three theories.  He claims that each of the three allegedly

wrongful employment practices described above constitute breach of contract (Count I),

breach of the implied covenant of good faith and fair dealing (Count II), and serious medical

condition discrimination in violation of the New Mexico Human Rights Act ("NMHRA")

(Count III).[2]  The Court considers each of the employment practices in turn.

### A.     Hostile work environment

Olguin's hostile work environment claim is based on allegations that he began to

experience threats, yelling, and received poor performance evaluations at Intel after the onset

of his various medical problems.   The Court concludes that the hostile work environment

claim fails whether it is characterized as a breach of contract, breach of the implied covenant

of good faith and fair dealing, or a violation of the NMHRA.

### 1.     Count I - Breach of Contract

Olguin claims that he experienced a hostile work environment, that he was otherwise

treated adversely while he was employed at Intel, and that the adverse treatment was the

result of discrimination.  Intel argues that Olguin's employment was at-will and that either

---

[2]Intel asserts various counterclaims against Olguin based on the alleged miscalculation and subsequent overpayment of disability benefits to him by its third-party administrator.  [Doc. 4 at 13–18.] Intel claims Olguin is obligated to repay it  out of an award of Social Security Disability benefits he received.  [Id.]  Intel's counterclaims are not at issue on this motion.

party therefore had the right to terminate the employment at any time and for any reason and

has submitted a copy of the Employment Agreement signed by Olguin indicating that

employment was at-will. [Docs. 16 at 8, 16-2.] Olguin, however, does not complain that he

was wrongfully terminated. The at-will nature of the relationship therefore does not

determine the issue.

Nevertheless, Intel has claimed that it was under no *contractual* obligation to refrain

from engaging in the acts of discrimination that Olguin alleges here. The burden thus shifts

to him to show there existed a *contract*, either express or implied, not to discriminate in this

manner. *See Stieber v. Journal Publ'g Co.*, 901 P.2d 201, 204–05 (N.M. Ct. App. 1995)

(employee who claimed employer discriminated against her in violation of employment

contract must offer proof that contract included duty not to discriminate). Olguin has failed

to meet this burden. Although he argues that a personnel manual can result in an implied

contract that modifies the terms of an employment relationship, he has not submitted

evidence of any such manual.

Olguin may not rely solely on Intel's admission that it has an anti-discrimination

policy. [Doc. 16 at 8.] Because he has failed to submit a copy of this policy, the Court

cannot evaluate whether the language it contains is sufficiently definite, specific, or explicit

to give rise to an implied contract. *See Garrity v. Overland Sheepskin Co. of Taos*, 917 P.2d

1382, 1386 (N.M. 1996) (holding that implied contract is created only where employer

creates a reasonable expectation as measured by "just how definite, specific, or explicit has

been the representation or conduct relied upon"). Furthermore, general equal opportunity

policy statements, such as Intel claims it has, "are insufficient to form the basis for a suit for breach of contract." *Stieber*, 901 P.2d at 205 (quoting *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465–66 (10th Cir. 1994) (applying Colorado law)).

Olguin has failed to raise a fact issue on his claim that Intel breached a *contract* not to discriminate.[3]  Accordingly, summary judgment must be granted on this claim.

> **2.      Count II - Breach of the Implied Covenant Good Faith and Fair Dealing**

Olguin claims the hostile work environment he allegedly experienced also constitutes a breach of the implied covenant of good faith and fair dealing.  [Doc. 1-6 at 9.]  "[T]he covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of the agreement." *Hemning v. Rounds*, 171 P.3d 317, 323 (N.M.Ct.App. 2007) (citation and quotation marks omitted).  However, there is "no general duty on the part of an employer to act 'nicely,'" and absent the denial of any contractual benefit, New Mexico law generally does not sanction a claim for breach of the covenant of good faith and fair dealing.  *Id.* (quoting *Avash v. Dana-Farmer Cancer Inst.*, 822 N.E.2d 667, 684 (Mass. 2005)); *see also Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1109 (N.M. 1988) (holding that there is no cause of action in New Mexico for breach of the implied covenant of good faith and fair dealing in at-will employment relationships).

In the present case, Olguin was not denied any contractual benefit by Intel's allegedly

---

[3]Olguin's noncontractual claims are addressed elsewhere in this opinion.

hostile treatment of him.  He does not claim he was terminated in bad faith, nor was he demoted, nor did he suffer a reduction in pay.  As discussed in more detail below, the Court concludes that neither the alleged failure to adjust his disability benefits nor the refusal to provide additional stock options constitutes a breach of the employment contract. Accordingly, summary judgment must be granted on this claim.

### 3.      Count III - NMHRA

Intel argues that summary judgment on Olguin's hostile work environment claim under the NMHRA is appropriate because Olguin failed to comply with the grievance procedure prescribed by the NMHRA.  The Court agrees.

Under the NMHRA's grievance procedures:

> A person claiming to be aggrieved by an unlawful discriminatory practice...may file with the human rights division of the labor department a written complaint that shall state the name and address of the person alleged to have engaged in the discriminatory practice, all information relating to the discriminatory practice and any other information that may be required by the commission.  All complaints shall be filed with the division within three hundred days after the alleged act was committed.

NMSA 1978, § 28-1-10A  Compliance with the grievance procedure of the NMHRA is mandatory and a prerequisite to judicial review.  *Luboyeski v. Hill*, 872 P.2d 353, 355 (N.M. 1994).  With respect to hostile work environment claims, the discriminatory practice of permitting a hostile work environment "occurs" at the time of any act contributing to the hostile environment.  *Ulibarri v. State*, 131 P.3d 43, 47 (N.M. 2006).

In this case, Olguin was not exposed to a hostile work environment for the entire twelve months preceding his termination in July 2005 because he was out on medical leave

during that time.  The last time that any act contributing to the allegedly hostile environment could have occurred was July 2004.  He did not file the Charge until May 19, 2006, nearly two years later.  The Charge thus was untimely because it did not comply with the NMHRA, which requires an aggrieved person to complain within 300 days.[4]  Accordingly, this claim must be dismissed for failure to exhaust administrative remedies.

In sum, Olguin has failed to meet his summary judgment burden with respect to the hostile work environment claim.  Summary judgment must be granted on the portions of Counts I, II, and III that are based on hostile work environment allegations.

**B.    Disability benefits**

**1.    ERISA-preempted contract claims**

As explained previously, Olguin's contract-based claims (Counts I and II) for disability benefits are preempted by ERISA.  For purposes of determining the merits, they are re-characterized as ERISA claims.[5]  *See, e.g.*, *Carland v. Metro. Life Ins. Co.*, 935 F.2d 1114 (10th Cir. 1991) (state law claims preempted by ERISA converted to federal claims and decided on the merits); *Karls v. Texaco*, No. 04-4110, 139 Fed.Appx. 29 (10th Cir. 2005) (unpublished) (breach of contract claim preempted by ERISA dismissed without prejudice

---

[4] The version of the statute in place at the time of the alleged hostile work environment required claimants to file a complaint with the HRD within 180 days.  NMSA 1978, § 28-1-10A (2005).  Amendments effective June 17, 2005 lengthened the period to 300 days.  NMSA 1978, § 28-1-10A  Because the alleged hostile conditions occurred prior to June 17, 2005, it is arguable that the 180-day requirement applies to Olguin's hostile work environment claim.  However, neither party has raised the issue.  Furthermore, the claim fails even if the longer period applies.  Accordingly, the Court need not determine which version of the statute is applicable here.

[5] Olguin has not moved to amend his Complaint to assert ERISA causes of action.

failure to exhaust).

Summary judgment on the ERISA-preempted claim for disability benefits is proper because Olguin failed to exhaust the remedies provided by the two plans.  "[E]xhaustion of administrative (i.e., company or plan-provided) remedies is an implicit prerequisite to seeking judicial relief."  *Whitehead v. Okla. Gas & Elec. Co.*, 187 F.3d 1184, 1190 (10th Cir. 1999) (quoting *Held v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir.1990)). Failure to exhaust plan-provided remedies is fatal to an ERISA claim.  *Id.*; *see also Karls*, No. 04-4110, 139 Fed.Appx. 29.

It is undisputed that both the Short-Term Disability Plan and the Long-Term Disability Plan have procedures for appealing benefit determinations.  It also is undisputed that Olguin did not avail himself of these procedures.  Accordingly, his contract-based claims for additional disability benefits, which are preempted by ERISA, must be dismissed for failure to exhaust the appeal procedures provided by the plans.

## 2.  NMHRA

### a.  *Preemption*

A matter that is not addressed by the briefing is whether ERISA preempts Olguin's disability benefits claims under the NMHRA.  ERISA's conflict preemption provision, section 514, states that ERISA preempts "all State laws insofar as they may now or hereafter relate to any employee benefit plan...."  29 U.S.C. § 1144(a).  Courts considering the "relate to" language have reached differing conclusions, but it has been determined that ERISA does not preempt state laws that have only a "tenuous, remote, or peripheral connection with

20

covered plans." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995) (quotation marks and citations omitted).  On the other hand, the Tenth Circuit has recognized four categories of laws that are preempted by ERISA: (1) laws regulating the type of benefits or terms of ERISA plans; (2) laws creating reporting, disclosure, funding or vesting requirements for such plans; (3) laws providing rules for calculating the amount of benefits to be paid under such plans; and (4) laws and common-law rules providing rules for calculating the amount of benefits to be paid under such plans. *David P. Coldesina, D.D.S., P.C., Employee Profit Sharing Plan & Trust v. Estate of Simper*, 407 F.3d 1126, 1136 (10th Cir. 2005); *see also Ingersoll-Rand v. McClendon*, 498 U.S. 133, 139–40 (1990) (stating that laws specifically designed to affect employee benefit plans, laws of general applicability that have the effect of regulating employee benefit plans, and specific causes of action in which denial of benefits is a central factor are preempted).

The Court need not determine whether ERISA preempts Olguin's NMHRA claim of discrimination with respect to disability benefits because it fails under both statutes.  To the extent it is preempted, the claim must be dismissed because Olguin failed to exhaust his administrative remedies by appealing the benefits decision pursuant to the procedures required by the plans.

b.    *Timeliness under NMHRA*

To the extent it is not preempted, the claim also fails under the NMHRA.  Under the NMHRA, it is an "unlawful discriminatory practice" for:

an employer, unless based on a bona fide occupational qualification or other statutory

21

> prohibition, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition.[.]

NMSA 1978, § 28-1-7A.  Olguin claims that he was subjected to adverse terms, conditions and privileges of employment due to his medical condition.

Intel argues that Olguin may not pursue his disability benefits claim under the NMHRA because he failed to timely raise it in the Charge he filed with HRD.  According to Intel, to be timely, the Charge should have been filed with HRD within 300 days of the October 2004 nationwide pay raise that Olguin claims should have resulted in an adjustment to his disability benefits.  In response, Olguin argues that his Charge was timely filed in May 2006 because the violation is ongoing in that he is currently being denied benefits.

Intel asserts that Olguin's "continuing violation" argument is foreclosed under the principles set forth in *Ledbetter v. Goodyear Tire & Rubber Co.*, __ U.S. __, 127 S.Ct. 2162 (2007).  In *Ledbetter*, our Supreme Court considered the timeliness of a pay discrimination claim under Title VII of the Civil Rights Act of 1964.  Plaintiff Ledbetter argued that she had been denied pay increases based on discriminatory performance evaluations that occurred over the nearly 20 years of her employment.  *Id.* at 2165–66.  She filed a formal charge with the Equal Employment Opportunity Commission ("EEOC"), but the Supreme Court held that her charge was untimely because no intentionally discriminatory acts had occurred within the 180 day charging period.  *Id.* at 2177.  The Supreme Court rejected Ledbetter's argument that each paycheck issued to her during the charging period constituted a separate act of

discrimination and held that "current effects alone cannot breathe life into prior, uncharged discrimination." *Id.* at 2169.  The Supreme Court instructed that she "should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her." *Id.*

New Mexico courts have not yet considered whether the reasoning of *Ledbetter* applies to continuing violation claims under the NMHRA.  Federal Title VII and similar civil rights adjudication, though persuasive, are not necessarily applicable to claims under the NMHRA.  *See Ulibarri*, 131 P.3d at 48; *see also Trujillo v. N. Rio Arriba Elec. Coop., Inc.*, 41 P.3d 333, 338 (N.M. 2002).  Although New Mexico does recognize the continuing violation doctrine as an equitable doctrine permitting a plaintiff to bring an otherwise untimely claim, *Ulibarri*, 131 P.3d at 47, it has yet to consider the applicability of the doctrine under facts such as are presented here.

Even if *Ledbetter* were applicable to a claim under the NMHRA, it is not clear that Olguin's charge was untimely if his allegations are taken as true and the facts are viewed in the light most favorable to him.  Though it is undisputed that the nationwide pay increase took effect in October 2004, Olguin claims that the decision to deny him increased benefits was made and communicated to him on September 9, 2005.  [Doc. 1-6 at 6; doc. 19-2 at 6.]  He filed the charge on May 19, 2006—252 days later.  If these facts are accepted as true, the charge was timely under the current version of the statute which requires a charge to be filed within 300 days.

      c.    *The NMHRA "otherwise qualified" requirement*

23

Intel offers an alternative argument, which is that the differential treatment Olguin complains of in the calculation of disability benefits does not constitute unlawful discrimination.  As support for this proposition, Intel cites *Fobar v. City of Dearborn Heights*, 994 F.Supp. 878 (E.D. Mich. 1998).  In *Fobar*, the plaintiff was a police officer who suffered several on-the-job injuries and became disabled and unable to work as a result. *Fobar*, 994 F.Supp. at 879.  He brought a claim under the Americans with Disabilities Act ("ADA") alleging that the defendant city's disability plan was discriminatory in that it did not provide the automatic benefit to spouses of disabled employees that was available to spouses of non-disabled employees.  *Id.* at 881.  The court in *Fobar* held that the plaintiff could not recover, in part, because he did not meet the definition of a "qualified individual with a disability" which is a necessary element of a claim under the ADA.  *Id.* at 881–82. A "qualified individual with a disability" is one who "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* at 881 (quoting 29 C.R.R. pt. 1630.2(m)).  Since it was undisputed that Plaintiff Fobar was medically disabled and could not perform the essential functions of his job, he was not a qualified individual with a disability, and was therefore not covered by the ADA.  *Id.* at 882.

Intel's argument is well-taken.  However, the Court need not refer to cases outside the jurisdiction because essentially the same conclusion reached in *Fobar* with respect to the ADA has been reached by the New Mexico Supreme Court under the NMHRA.  *See Kitchell v. Pub. Serv. Co. of N.M.*, 972 P.2d 344 (N.M. 1998).  Kitchell was a power plant mechanic who contracted severe eczema as a result of the working conditions at his job.  *Id.* at 345.

He became totally disabled and eventually was terminated. *Id.* He received benefits under his employer's health indemnity plan, but they were terminated at the same time as his employment. *Id.* Similar to the ADA, the NMHRA prohibits discrimination against certain persons who are "otherwise qualified." *Id.* (quoting NMSA 1978, § 28-1-7). The New Mexico Supreme Court held that the term "otherwise qualified" in the NMHRA means "one who is able to meet all of the program's requirements *in spite* of his handicap." *Id.* at 346 (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397 (1979)) (emphasis in original). Kitchell admitted that because of his disability he was not "otherwise qualified" to do his job. *Id.* at 346. Though Kitchell argued that it was fundamentally unfair for an employer who is responsible for a worker's disability to terminate the worker and end company benefits, the New Mexico Supreme Court concluded that the NMHRA was not designed to provide a remedy in such cases. *Id.* at 347. Accordingly, Kitchell's claim was barred as a matter of law. *Id.* at 347. *See also Chavez v. Qwest, Inc.*, 483 F.Supp.2d 1103, 1112–13 (D.N.M. 2007) (holding that employer did not violate NMHRA where disabled employee was unable to return to work and therefore was not "otherwise qualified").

Olguin's claim for disability benefits is similarly barred. The term "medical condition" under the NMHRA is equivalent to the term "disability" under the ADA. *Trujillo*, 41 P.3d at 338. Olguin concedes that, because of his "serious medical condition"—or disability—he is unable to hold his position at Intel. Pursuant to the New Mexico Supreme Court's holding in *Kitchell*, he therefore is not "otherwise qualified" and the NMHRA is inapplicable to his claim for disability benefits.

25

In sum, Olguin has failed to meet his summary judgment burden with respect to his claim for disability benefits.  Summary judgment must be granted on the portions of Counts I, II, and III that are based on allegations that Intel failed to properly pay disability benefits.

### C.     Stock options

Olguin's stock option claim is based on allegations that Intel was obligated to award him 12,549 stock options, but only awarded him 393 options.  The Court concludes that this claim also fails whether it is characterized as a breach of contract, breach of the implied covenant of good faith and fair dealing, or a violation of the NMHRA.

#### 1.     Breach of contract

Olguin alleges in his Complaint that Intel committed a breach of contract "by informing him that he had 12,549 shares of stock and after verifying the correct amount...changed the amount of the shares to at total of 393 shares."  [Doc. 1-6 at 8.]  To survive summary judgment, Olguin must offer evidence of the existence of a contract for 12,549 shares.  *McCasland v. Prather*, 585 P.2d 336, 338 (N.M.Ct. App. 1978) (existence of a valid and binding contract is an element of breach of contract claim).

Olguin has offered no such evidence.  He does not dispute that under the terms of Intel's various stock option plans he had accumulated only 393 unexpired and unvested stock options before he was terminated.  He also does not dispute that the November 7, 2005 letter informing that he had 12,549 stock options was in error.  Though he characterizes the letter as "binding" and argues that he is "entitled" to the extra shares, he does not explain how an undisputedly erroneous statement creates a contractually-binding obligation or entitles him

26

to stock options that he was not otherwise entitled to receive.

Furthermore, the letter at issue does not, as Olguin claims, purport to grant or offer him additional stock options.[6]  It only offers to accelerate the vesting of his options:

> Based on the special circumstances of your situation, we have received approval from the Compensation Committee of the Board of Directors, or its delegates, to accelerate a portion of your stock options.  Upon receipt of a signed copy of this letter, we will accelerate the stock as noted below.

[Doc. 16-15 at 1.]  Olguin does not claim that Intel reneged on its promise to accelerate his options.  It is undisputed that the vesting date for 393 options was accelerated, that Olguin did not exercise any of the accelerated options, and that they all expired on July 12, 2007.

The undisputed facts thus demonstrate that Olguin was only entitled to 393 stock options, that the options were accelerated, and that there was no contract for 12,549 stock options.  Because Olguin has failed to show the existence of a contract for 12,549 stock options, he cannot prevail on a breach of contract claim, summary judgment must be granted.

## 2.    Breach of Implied Covenant of Good Faith and Fair Dealing

Olguin claims that the refusal of Intel to provide 12,549 stock options rather than 393 stock options also constitutes a breach of the covenant of good faith and fair dealing.  In New Mexico, however, the implied covenant of good faith and fair dealing depends upon the existence of an underlying contract.  *Elliott Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1114 (10th Cir. 2005) (citing *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909 (N.M.Ct.App.

---

[6]The 2004 Equity Incentive Plan defines "stock options" as "a right to purchase a number of Shares at such exercise price, at such times, and on such other terms and conditions as are specified in or determined pursuant to the document(s) evidencing the Award (the "Option Agreement")."  [Doc. 16-13 at 2.]

2003)).  "The implied covenant is aimed at making effective the agreement's promises." *Azar*, 68 P.3d at 925.  It is not breached unless a party has been denied some contractual benefit.  *Id.*

Here, no underlying contractual obligation was breached.  Intel only promised to award Olguin 393 stock options.  As discussed previously, because there was no contract to award 12,549 stock options, Olguin cannot show that he was denied any contractual benefit. Accordingly, Intel is entitled to summary judgment on this claim.

### 3.    NMHRA

Olguin's stock option claim under the NMHRA, like the disability benefits claim, is precluded by *Kitchell*.  Olguin was not "otherwise qualified" to perform his essential job functions when the alleged denial of stock options occurred.  Therefore, the claim does not fall under the NMHRA.

Even if the NMHRA applies, the stock option claim would be barred for the reason that Olguin failed to raise it in the Charge he filed with HRD.  A plaintiff may only seek judicial review with respect to allegations that are "reasonably related to the allegations in the administrative charge."  *See Aramburu v. Boeing, Inc.*, 112 F.3d 1398, 1409 (10th Cir. 1997) (considering exhaustion of claims under Kansas law and Title VII).

The only allegations detailed in the Charge's "Statement of Harm" relate to Olguin's claim for disability benefits.  The "Statement of Harm" submitted to the HRD states in its entirety:

I have been on short-term disability since July 2004.  The Respondent had agreed to

28

> pay me 65% of my base pay while I was on leave.  I was told the rate of pay would
> not be adjusted for merit, promotions, etc until the first day in which I would return
> from leave.  In October 2004, the Respondent changed its pay practices nationwide;
> all base pay was to be adjusted upward.  I contacted the Respondent and was told my
> pay would increase based on this adjustment, because this was not considered a merit
> or promotional increase.  I have not received the increase with the latest date being
> March 1, 2006.

[Doc. 16-18 at 1.]  In response to Intel's motion, Olguin presents two documents that he

claims were submitted to HRD to support his Charge.  [Docs. 19-2, 19-3.]  Though these

documents have not been authenticated, Intel does not dispute them.  The Court therefore

accepts them for purposes of determining whether Olguin has met his summary judgment

burden.

Olguin's Exhibit A is his "Entry of Appearance, Statement of Harm (Continuing

Violation) (Serious Medical Condition), and Chronology."  [Doc. 19-2]  This document

chronicles his history of leave and medical issues, as well as the acts allegedly contributing

the hostile work environment.  [Id. at 1–6.]  It also states that he did not receive an increase

to his disability checks after the nationwide pay increase went into effect.  [Id. at 6–7.]  It

does not mention his complaint regarding stock options.

Olguin's Exhibit B is "Complainant's Rebuttal to Respondent's Response."  [Doc. 19-

3.]  This document further elaborates on his claim for disability benefits.  Although the term

"Stock Option Benefit Program" is used as a heading, the discussion under that heading

relates to his claim for disability benefits, not stock options.  [Id. at 2–5.]

Nowhere are the stock options and Intel's purported failure to award stock options

discussed in the Charge or in the other documents Olguin claims he presented to HRD.  The

29

Court thus concludes that the stock option claim was was not within the scope of the administrative charge Olguin filed with HRD.  He has submitted no evidence that would indicate the stock option claim was exhausted.  Accordingly, summary judgment must be granted on this claim.

In sum, Olguin has failed to meet hisburden with respect to his stock option claim. Summary judgment must be granted on the portions of Counts I, II, and II that are based on allegations that Intel failed to award stock options.

## V.    CONCLUSION

The Court concludes that Defendant's motion is well-taken and should be **GRANTED**.

**IT IS, THEREFORE, ORDERED** that the *Defendant Intel Corporation's Motion to Dismiss or, in the Alternative, for Summary Judgment* [Doc. 15] is **GRANTED.**

**IT IS, FURTHER, ORDERED** that Plaintiff's hostile work environment and stock options claims under Counts I, II, and III are **DISMISSED with prejudice**;

**IT IS, FURTHER, ORDERED** that Plaintiff's ERISA-preempted claims for disability benefits under Counts I, II, and III are **DISMISSED without prejudice** for failure to exhaust administrative remedies.

**SO ORDERED** this 26th day of September 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge